Filed 5/7/15  P. v. Ontiveros CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B256147 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA130459) |
| v. | |
| ANDRE ONTIVEROS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Michael Cowell, Judge.  Reversed with directions.

Robison D. Harley, Jr., for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Appellant Andre Ontiveros and a friend were involved in a physical altercation with an acquaintance—a cousin of his sometimes-girlfriend—during which Ontiveros stabbed the victim a number of times with a "butterfly" pocket knife. An information was filed charging Ontiveros with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), and alleging that he personally inflicted great bodily injury on the victim (Pen. Code, § 12022.7).[1] Ontiveros pleaded not guilty and denied the great bodily injury allegation. A jury found him guilty, and found the allegation to be true.

Ontiveros's timely appeal from the resulting judgment contends he was denied the effective assistance of counsel at trial, and that the trial court erred in denying his motion on that ground for a new trial. We conclude that Ontiveros was denied his right to effective counsel, and the trial court erred in denying his motion for new trial.

## Background

### A. Prosecution evidence

The prosecution presented the testimony of Armando Torres that on June 3, 2013, he lived in a tent behind his grandparents' house on Joliet Avenue in the Hawaiian Gardens area of Los Angeles. Torres's then-17-year-old cousin Alicia and her younger brother Aaron, Alicia's mother Connie Villacava, and the mother's parents (Torres's, Alicia's, and her brother's grandparents) lived in the main house.[2] Torres was then 31 years old, 5 feet 11 inches tall, and weighed about 210 pounds.

About 4:00 o'clock that afternoon, Torres was walking home carrying a grocery bag and a sandwich in a bag. As he crossed the street toward his house he saw Ontiveros and a friend going to the friend's house next door. Torres knew Ontiveros as his cousin Alicia's boyfriend or former boyfriend, but he did not then know Ontiveros's name. He did not know Ontiveros's friend, Marcos Martinez, who lived in the house next door.

When Torres reached to open his front gate he heard someone say "I'm going to fuck him up," and turned to see that it was Ontiveros. Ontiveros then walked toward

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

[2] We refer to the then-minor members of Torres's family by their given names only, meaning no disrespect.

2

Torres, saying "Yeah, I got my blade out, ready to stab you in the neck." Ontiveros swung his arm, holding a knife with a blade about three inches long, stabbing Torres's neck under his jaw. Torres dropped his bags and grabbed Ontiveros, pulling him close so he would have no room to swing his arm. Ontiveros tried to again swing his arm, stabbing Torres behind his ear. Torres pushed Ontiveros a few feet away. Ontiveros continued swinging the knife, first overhand then underhand, cutting Torres under his arm. Torres stepped off the curb, falling to to his knees, grabbing Ontiveros's legs and pulling him to the ground. When Torres grabbed Ontiveros's wrist, Ontiveros called to his friend Martinez, "Get him. Get him. Get him. Get him on the set. Get him on the set," and "Get him before he gets the knife." To Torres, "Get him on the set" was terminology meaning "Help me. We're in the same gang," or clique.[3] Martinez then started punching Torres in the face and head, and kicking Torres in the back, while Torres held Ontiveros's wrist and hand that held the knife.

Torres let go of Ontiveros's wrist after Martinez stopped punching and kicking him. He then saw Alicia standing in the driveway, pointing her finger and screaming "That's what you get." Martinez began pushing Ontiveros away, saying "The cops, the cops. Let's go, let's go." As Martinez pushed him away, Ontiveros raised his hand simulating a gun, and Torres heard him say something like, "so and so has a gun in their house," and "We're going to come back. We're going to get you. We're going to blast you."

Torres then followed Alicia into the house, knocking on the door of her room, saying "This is what I get? Come see what the love of your life just did to me." He then went into the bathroom, where he was able to stop some of the bleeding. When his grandmother saw him, she called 911. Torres was taken to the hospital by ambulance. The jury was shown photographs of his eight stab wounds before and after they were stitched, as well as bruises on his face from Martinez's punches, and Torres removed his

---

[3] Torres's testimony at the preliminary hearing had been that Ontiveros had said, "Get him, get him, get him on the head," rather than "get him on the set." Torres testified that the transcript was in error.

outer shirt to display his scars. According to Torres, he did nothing to provoke Ontiveros's attack. The knife used in the incident was not recovered.

Torres denied that he disliked Ontiveros, but admitted that he had had three or four incidents with Ontiveros during the previous five years, including one when Ontiveros was between 13 and 15 years old. Alicia had snuck Ontiveros into the house, and Torres was upset when he found Ontiveros in her room with the door locked. He kicked Ontiveros out of the house after seeing multiple hickeys on Alicia's neck.

The prosecution offered into evidence a diagram (exhibit 9) and a photo (exhibit 10), purporting to depict "butterfly" knives, the type of knife Ontiveros had allegedly used in the attack on Torres. It initially argued that the exhibits depicting butterfly knives should be admitted because "first of all, it's illegal to possess a butterfly knife"; and also so a detective could describe how it is used, in order to support the prosecution's argument that "it would be very difficult to remove, open, and use that knife under the circumstances that he is going to describe." The prosecutor assured the court that "I am certainly not suggesting that is the knife that was used."

The court initially sustained the defense objection to the pictures, which showed what the court described as a double-edged "wicked looking" blade, "which makes it a dirk." The court ruled that a witness could describe and define a butterfly knife, but "I don't want the jury to see that image," and "he's not going to use pictures of the weapon when there's no foundation."[4]

Detective Dumser of the sheriff's department then testified that when closed, a butterfly knife looks like a knife handle with no blade; but when the two parts of the handle are unlatched and it is manipulated to let go of one of the bars, the bar swings around and the blade is exposed and ready to use. Such a knife can have a blade from one to six inches long. He testified also that "butterfly knives are double edged blades, making it a dirk or dagger." When he finds someone with a butterfly knife, the detective testified, he removes it and arrests the person for possession of an illegal knife.

---

[4] Defense counsel initially objected to the exhibits on the ground that they had not been disclosed earlier, not that they were otherwise objectionable.

4

Detective Dumser also testified to the account Ontiveros had given him three days after the incident, when Ontiveros had appeared at the station to tell his side of the story.[5] He told the detective that he had an altercation with Torres, during which he had stabbed Torres in self-defense. Ontiveros had said that he had crossed paths with Torres as he walked home after applying for a job at the nearby WalMart. As Ontiveros and his friend Martinez were entering Martinez's gate, and Torres was entering his driveway (next door to Martinez's driveway), Torres had turned and said something to Ontiveros, like "What," "What's up," or What's going on?" Then Torres began to walk toward Ontiveros in an aggressive manner with clenched fists. Ontiveros warned Torres that he had a knife, and said to leave him alone and that he did not want any problems. Torres (who was described as about five inches taller and 60 pounds heavier than Ontiveros) threw a punch that Ontiveros dodged, then grabbed Ontiveros and slammed him to the ground. While on the ground with Torres on top of him—fearing for his life—Ontiveros removed the knife (which he described as a butterfly knife with a one-inch blade) from his front pants pocket. Torres placed his arms on Ontiveros's right arm, trying to gain control of the knife, and moving the arm and knife toward Ontiveros's neck. Ontiveros then called his friend Martinez to help, and not to let Torres get the knife.

After Martinez hit and kicked Torres three or four times Ontiveros was able to disengage from Torres, and they both stood up. He described having stabbed Torres in the side and in the neck or cheek while they were on the ground, as Torres pushed him back down and tried to choke him.

Ontiveros told Torres to stop, and to leave him alone; Torres laughed, and "charging" at Ontiveros, said he was not afraid of him. Ontiveros said he then ran backward, while stabbing Torres about six more times in the neck, side, and chest. After Torres stopped charging, Ontiveros walked away, scared, discarding his shirt and the

---

[5] Ontiveros and his mother were driven to the police station by Torres's aunt Connie and her daughter Alicia. After telling the police why they were there and waiting in the lobby, Ontiveros was arrested and taken to an interview room.

knife in a trash can at a nearby bus stop. Ontiveros said his right arm was injured when they struggled for the knife, and he had a small cut on his right thumb.

The prosecution then asked for the admission of its exhibits—including the two depicting butterfly knives—into evidence. Upon confirming that it was Ontiveros—not Torres—who had identified the weapon as a butterfly knife, the court reversed its previous ruling against the exhibits' admission. Specifically because Ontiveros had admitted that he had a butterfly knife, the court ruled that the pictures could be admitted "as simply illustrative of what a butterfly knife is," because "it is relevant under the circumstances." The detective was then recalled to authenticate depictions of butterfly knives, and to explain to the jury how a butterfly knife is opened and used. He also specifically confirmed that "these two examples [in exhibits 9 and 10] are simply illustrative of what the form or function of a butterfly knife is, but . . . not suggesting in any way that the length [of] the blade is relevant to what happened in this case . . . ." The prosecution then rested.

## B. Defense evidence

The defense presented the testimony of Sheriff Detective Beas that she had spoken at the scene with Torres on the afternoon of the incident, while he was still bleeding and before he was taken away by ambulance. Torres had told her that he had been stabbed by two males, whom he could not name. He said he was walking home from the liquor store when he was approached from behind and turned to see Ontiveros standing there with a knife. Ontiveros said, "Hey, I got my knife to stab you." But Torres did not say that Ontiveros had said anything about a gun; nor had Ontiveros said anything about coming back to blast him—significant things that would be in her notes if Torres had told them to her.

Ontiveros's mother, Judith Ontiveros, testified that she learned of the incident when Ontiveros came home for about five minutes at 5:00 or 5:30 in the afternoon of June 3rd. She could tell something was wrong. When he came home the next day, he was "just shaken up, kind of teary eyed," telling her about what had happened. He was also bruised badly on his back, his knuckles were scraped, and could not raise his arm.

6

She took him to see a doctor. The jury was shown photographs purporting to show Ontiveros's bruising and knuckles, taken by his mother after he left the police station after his arrest. Ontiveros's mother had seen Ontiveros use his butterfly knife, which had a blade about an inch long, as a tool, for tasks such as adjusting a tent at a family barbeque and to open presents at his younger brother's birthday.

Ontiveros testified he had known Torres and her cousin Alicia, his ex-girlfriend, for three and one-half years, and that before the incident Torres had shaken his hand in an intimidating manner, and referred to him by name. Before the incident Ontiveros had visited Alicia at her family home almost every day, with her grandparents always present, and her mother, younger brother, and cousin often present. He had tutored Alicia's younger brother. Although he had a relationship with the family, he did not with Torres, whom he regarded as a bully.

Ontiveros said that on the occasion in Alicia's room some years earlier that Torres had described, he and Alicia had heard Torres knock and tell Alicia to open the door to her room. When Alicia did not immediately open it, Torres barged through the door, breaking the lock, then shoving Ontiveros out of the house.[6] Ontiveros had seen Torres

_____

[6] Ontiveros also began testifying to an example of Torres's bullying that had occurred a few weeks before the stabbing incident, when Ontiveros was in the living room watching television with Alicia, and Alicia's grandparents and uncle were also in the house. Torres had come into the house intoxicated, seeking to fight Ontiveros (for unknown reasons). But Alicia's mother returned home from work just in time to step between Torres and Ontiveros. She pushed Torres away, saying to him "You're drunk, why are you fighting with this kid. You're a 30-year-old man." The prosecution then objected (apparently because the statement that Torres was drunk was hearsay). The court ordered the entire answer stricken, denying a defense request to approach to argue the point.

Ontiveros was permitted to testify that he had witnessed Torres acting as a bully on another occasion, when Ontiveros had taken the family's trash to their back yard. Torres said something unintelligible that indicated his anger at Ontiveros, before falling on his face, very intoxicated. And the court reiterated its earlier ruling (consistent with the parties' agreed jury instructions) that evidence of instances or suggestions of violence by one party against the other would be admissible if they had been known to the other party, either from personal observation or from having been told about them by others.

7

lose his temper with him on several occasions, and he was afraid of Torres because of Torres's size compared to his own.

Ontiveros testified that he had bought his butterfly knife at a swap meet about two years before the incident. Its handle latch was broken so it would open when flicked, and it had a blade about one inch long. He had never used or threatened anyone with the knife before the June 3rd incident, but he had often used it as a screwdriver or other tool at family occasions. According to his driver's license, he is 5 feet 6 inches tall, and 150 pounds.

Describing the June 3rd incident, Ontiveros testified that Torres had brushed past him as he and Martinez stopped in front of the gate to Martinez's yard; how he heard Torres say "What, what, what did you say?" while coming toward him; how he stepped out of the gate (to avoid any problems at his friends house), and told Torres to go inside his house, warning that he had a knife, and showing Torres the knife handle without opening the knife to expose the blade.

Ontiveros then believed Torres would go into his house, but when he put the knife back into his pocket, Torres charged at him, and he and Torres began fighting. According to Ontiveros, when Torres first tried (unsuccessfully) to pick Ontiveros up using his head in Ontiveros's pelvis area, Ontiveros hit the left side of Torres's face; then Torres was able to lift Ontiveros and slam him to the ground on his back (causing back bruises seen on a photo shown to the jury). With Torres lying on him and his legs around Torres's torso, Ontiveros then withdrew the knife from the watch pocket of his jeans, and flicked it open with one hand, as Deputy Dumser had explained to the jury could be done with a butterfly knife.

Ontiveros swung the knife, hitting Torres somewhere near his left rib. He tried to swing again, but Torres caught the knife, trying with both hands to pry it from Ontiveros's hand, while grinding Ontiveros's hand on the concrete pavement. When he

But it then immediately barred Ontiveros from testifying to such instances about which he had been told by others, because "he has known this person a long time. He has first-hand knowledge.

8

was unsuccessful in forcing the knife from Ontiveros's hand, Torres pushed the hand and knife toward Ontiveros's neck. Ontiveros then screamed for Martinez to help before Torres could get the knife. Martinez joined the fray, hitting and kicking Torres's back and the back of his head, causing Torres to release Ontiveros's wrist. Seeing Torres reach to get him in a chokehold, Ontiveros (still on his back on the ground under Torres) kicked Torres and swung upward, stabbing him under the cheek. Ontiveros was then able to push Torres off him.

They both stood up, a few feet apart. Ontiveros told Torres to stop and to go inside, while Torres looked at Ontiveros, saying "I'm not scared of you." Torres continued to charge Ontiveros, and Ontiveros continued to back up, swinging the knife back and forth, sometimes hitting Torres, until someone called from a car that the police were coming. Ontiveros was then able to turn and "speed-walk" away. He stopped briefly at his nearby home, then went to his school, discarding the knife and bloody shirt in a waste can on the way.

## C. The verdict

The jury found Ontiveros guilty of assault with a deadly weapon, a knife, in violation of section 245, subdivision (a)(1), and found that he personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a). The court sentenced Ontiveros to five years in prison—the low term of two years for the assault, plus three years for the personal infliction of great bodily injury.

## D. Motion for new trial

Represented by new counsel, Ontiveros filed a motion and supplemental motion for new trial based on ineffective assistance of counsel.[7] The motion contended that Ontiveros's trial counsel had been ineffective in a number of respects: (1) by failing to present available witnesses to support Ontiveros's self-defense theory; (2) by failing to object to prejudicial gang evidence; (3) by failing to object to references to Ontiveros's juvenile record; (4) by failing to object to prosecution insinuations that Ontiveros had

---

[7] The trial court declined the defense offer to present the supporting witnesses' live testimony.

acted immorally and had molested Torres's cousin, Alicia; (5) by failing to object to statements that Ontiveros's possession of the butterfly knife was illegal and that it constituted a dirk or dagger, and by failing to present available evidence that it was not. The motion was supported by declarations of Martinez, Alicia, and Alicia's mother, and juvenile court records reflecting that when he was 14 years old he had been arrested for possessing spray paint and tools with intent to vandalize (§ 594.2, subds. (a), (e)), and vandalism (§ 594.2, subd. (a)(1)), that he had been granted a deferred entry of judgment, that he had successfully completed its requirements, and that his juvenile court records had been sealed and "the arrest is deemed never to have occurred."[8]

The prosecution filed no written opposition to the new trial motion. Noting that the inadequate-assistance-of-counsel contention might be a ground for reversal on appeal, the trial court held that it would not justify granting a new trial. Ontiveros filed a timely appeal.

## Discussion

Section 1181 sets forth the nine grounds on which a trial court may grant a new trial. The enumerated grounds include (in addition to grounds not relevant to this case) circumstances in which the court has erred in its legal rulings or misdirected the jury; but they do not include the defendant's failure to receive the effective assistance of counsel. (§ 1181, subd. (5).)

The right to the effective assistance of counsel is a constitutional requirement, which the court must protect without regard to statutory limitations on the permissible grounds for new trial motions. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582.) Thus an order granting a new trial may be appropriate in some circumstances even when counsel has failed to interpose appropriate objections or to introduce appropriate evidence. A right to a new trial is established if the record shows "that trial counsel acted

_____

[8] The Deferred Entry of Judgment had imposed conditions such as a nighttime curfew, maintaining satisfactory school attendance and grades, 100 hours of community service, and $50 restitution. In mitigation, the defense also submitted 13 letters from friends, teachers, employers, and relatives attesting to Ontiveros's good and peaceful character.

10

or failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates," and establishes "that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." (*Id.* at p. 584; *People v. Pope* (1979) 23 Cal.3d 412, 425.) And it may be appropriate even where a potentially meritorious defense was not actually withdrawn. To prevail on a motion for new trial based on the ground that the defendant received ineffective assistance of counsel, "a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" (*People v. Andrade* (2000) 79 Cal.App.4th 651, 659-660.)

The trial court's determinations in ruling on the motion for new trial on the issues of error and prejudice are reviewed for abuse of discretion. (*People v. Ault* (2004) 33 Cal.4th 1250, 1255; *People v. Callahan* (2004) 124 Cal.App.4th 198, 210-211.)

In this case the record leaves it doubtful that the trial court applied the appropriate tests in ruling on the new trial motion. The court accepted the defense offer of proof that Martinez could have been produced to testify about what the knife actually looked like (refuting the testimony that it was an illegal dirk, with a long blade such as those depicted in the exhibits). And the court agreed that the defense might have called Martinez and other witnesses who could have testified who had started the altercation. But according to the court, "the point is the defendant is not being deprived of a defense of self-defense. He testified as to the nature of the self-defense. . . . The jury heard all of this evidence." Perhaps conceding that counsel's representation of Ontiveros had been deficient when measured against that of other reasonably competent attorneys (see *People v. Fosselman*, *supra*, 33 Cal.3d at p. 582), the court asked, "Do I think [defense counsel] presented the greatest defense imaginable?" and answered, "No, I do not." (To that the court added, "But he hired her. She was his attorney of choice.")

However, although the court believed the evidence against Ontiveros was overwhelming, the court apparently did not consider whether counsel's deficient

11

performance prejudiced Ontiveros by "'so undermin[ing] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" (*People v. Andrade*, *supra*, 79 Cal.App.4th at pp. 659-660.) It ruled instead that "the point is that the defendant is not being deprived of a defense of self-defense" because the jury did not accept his defense. "The jury heard the evidence. It was overwhelming. . . . [¶] [T]he jury heard what he claimed happened. They did not believe it. They didn't buy it. And they convicted him."

We conclude that the record sufficiently establishes that Ontiveros's counsel failed in identifiable ways, discussed below, to act in a manner expected of a reasonably competent attorney acting as a diligent advocate, and that trial court error exacerbated the prejudicial impact of those failures.

**A. Failure to call witnesses to support the defense of self-defense**

The new trial motion was supported by declarations of Martinez, Alicia, and Alicia's mother, none of whom were called to testify at Ontiveros's trial.

### 1. Martinez

Martinez testified at Ontiveros's preliminary hearing, about three and a half months after the incident and six months before the trial. He was a percipient witness to the entire incident, including the manner in which it arose. His testimony strongly contradicted Torres's account of the event and supported Ontiveros's self-defense theory.

Martinez's preliminary hearing testimony had been that it was Torres who had begun the aggressive words and movements toward Ontiveros; that Ontiveros had reacted by warning Torres to leave him alone, displaying the closed knife without the blade exposed, then putting the knife away in his watch pocket; that Torres had then charged at Ontiveros, trying unsuccessfully to punch him; that as Torres and Ontiveros fought with their fists, Torres picked Ontiveros up and slammed him to the ground on his back, with Torres on top of him; and that Ontiveros then again had the knife in his hand, this time with the blade exposed. Martinez testified that at that point Torres was on top of Ontiveros, trying with both hands to grab the knife, and scraping Ontiveros's knuckles on the pavement; that Martinez began hitting and kicking Torres "because I feared for my

12

friend's life"; that Ontiveros then stabbed Torres in the neck; that both Ontiveros and Torres then stood up, and Torres said with clenched teeth, "I'm not afraid of you," and they continued fighting until someone said the police are coming.

Martinez testified that although the handle of the knife was "pretty big," its blade was "tiny."

Martinez's declaration summarized his preliminary hearing testimony, saying that Torres "definitely started the fight," and that "[f]rom what I saw [Ontiveros] was only defending himself from being seriously injured by Torres," who was "a lot bigger, heavier, and stronger and older." The declaration also confirmed that Martinez had told Ontiveros's trial counsel "that I was ready, willing and able to testify at Ontiveros's trial that Torres attacked Ontiveros for no apparent reason and that Ontiveros was only trying to defend himself," but that "for unknown reasons" he was not called to testify.

### 2. Connie Villacana

The declaration of Connie Villicana (Alicia's mother and Torres's aunt) in support of the new trial motion offered her testimony that before the altercation between Torres and Ontiveros she had found it necessary on various occasions to intervene to prevent Torres from attacking Alicia and Ontiveros.

### 3. Alicia

Alicia Villicana's declaration in support of the motion for new trial supported Ontiveros's testimony in many respects. She said that since January 2010 (more than three years before the incident) she had had "an on-again off-again boyfriend-girlfriend" relationship with Ontiveros; that Ontiveros had been at her grandparents' house almost every day from 2009 to June 2013; and that Torres always interacted with Ontiveros "in a rude, intimidating and threatening and aggressive way." Alicia verified that her mother had at least once stepped in to stop Torres from attacking Ontiveros (in addition to recalling a number of other times Torres had acted violently toward her and her brother). This evidence would have contradicted Torres's account to the police that before the fight he bore Ontiveros no animosity. And she supported Ontiveros's description of how the fight progressed. She said she had arrived when Torres was on top of Ontiveros; that

13

Torres had his hands around the knife, and was succeeding in pushing it slowly toward Ontiveros's neck while Ontiveros tried to push it away, until the knife was just a few inches from Ontiveros's neck when Martinez intervened by hitting and kicking Torres in the back.

Her declaration stated that "[f]rom what I saw and heard, Torres was the aggressor and Andre Ontiveros was acting in self-defense." And it confirmed that she had informed Ontiveros's trial counsel that she was ready, willing, and able to testify, but was not called.

### 4. Prejudicial impact

Ontiveros's only defense at trial was the theory of self-defense. But he was the only witness the defense called to testify that Torres had acted aggressively and had bullied him in instigating the fight and on previous occasions. He was the only witness to testify that he had not opened the knife until the much larger Torres had thrown him to the ground and pinned him down. And he was the only witness to testify that it was after Torres had tried to push the knife to his neck that he had stabbed Torres in the cheek. Ontiveros's new trial motion contended that his counsel's ineffective assistance is evidenced by her failure to present the testimony of other witnesses that were available to support his account of the circumstances, and thereby bolster his defense. (*People v. Shaw* (1984) 35 Cal.3d 535, 541-542 [ineffective assistance of counsel found for failure to investigate and call witnesses to support arguably meritorious alibi and mistaken identity defense].)

The failure of the defense to call supporting witnesses was repeatedly called to the jury's attention, and cited as a reason to reject Ontiveros's defense. The prosecution specifically noted the absence of the witnesses who could have verified Ontiveros's account. It reminded the jury that although Martinez had witnessed the incident, he was not called to verify Ontiveros's account, and that although Alicia had been present for part of the fight, "we did not hear from her either." It ridiculed Ontiveros's testimony that Torres had bullied him in the past, suggesting that the lack of evidence to document Ontiveros's account was "because none of these things ever happened." It told the jury

14

that after Torres had presented himself on the witness stand as a calm, rational, and scholarly witness, the defense theory that he had been bullying Ontiveros since he was 14 years old, and had lost his temper again for no reason on the day of the fight, was a "ridiculous story." "Where are these people? Where is Connie?" the prosecution asked.

In its closing argument to the jury the prosecution repeated its opening argument admonition to not credit Ontiveros's version of the events: "[T]here's such a thing as failure to call logical witnesses, if you're going to suggest that things occurred in a certain manner and you have some witness who logically would be within your reach, like the girlfriend, like your friend who was there to back you up, like your aunt or whomever else. Why aren't they there, you know, I mean we're talking about Alicia. We're talking about Marcos Martinez. Connie Villacana. . . ."

By repeatedly exploiting the absence of testimony from these available supporting witnesses, the prosecution demonstrated its belief that the failure to produce their testimony should influence the jury to reject Ontiveros's defense. On this record, we cannot conclude that the failure was not prejudicial to Ontiveros's defense.

**B. Failure to object to evidence that Ontiveros's knife was illegal**

In the absence of the actual knife (and after the court had ruled the prosecution's proferred images of butterfly knives were inadmissible as speculative and "wicked looking"), Detective Dumser explained to the jury that a butterfly knife is a knife with a blade that is not exposed until, with a flick of the wrist, the two sides of the handle open "and have the blade pop out." And he testified—without objection from Ontiveros's counsel—that because "most that I have seen" have had blades sharpened on both sides, it is an illegal knife, without regard to the length of the blade.

But Dumser's testimony about the illegality of knives with blades sharpened on both sides had nothing to do with the evidence in this case; there was no evidence at all that Ontiveros's knife (or all butterfly knives) had a blade sharpened on both sides. Nor are all butterfly knives illegal, without regard to the length of their blade, as Dumser testified they were. The law does not specifically define a "butterfly" knife, but it defines an illegal switchblade knife as "a knife having the appearance of a pocketknife and

15

includes . . . any other similar type knife, the blade or blades of which *are two or more inches in length* and which can be released automatically by a . . . flip of the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever." (§ 17235, italics added; *People ex rel. Mautner v. Quattrone* (1989) 211 Cal.App.3d 1389, 1395 ["butterfly" knife is within statutory definition of switchblade knife].) A butterfly or switchblade knife is not illegal, unless its blade is two or more inches long. (§ 21510.)

The trial court eventually admitted the "totally prejudicial and speculative" images in exhibits 9 and 10 into evidence (despite the prosecution's concession that it could certainly come up with other less menacing-looking examples of a butterfly knife, "whether it's a shorter blade or anything else"), explaining that it had misunderstood that it was the victim, not the defendant, who had described the knife as a butterfly knife.[9] Dumser explained to the jury that the blade might have a single or double edge, and might have different possible lengths, and the court had him confirm that the exhibits are "simply illustrative of what the form or function of a butterfly knife is, "but you're not suggesting in any way that the length [of] the blade is relevant to what happened in this case." According to the court, it ruled "on the basis of [Ontiveros's] admission that he had a butterfly knife," and as to whether or not a butterfly knife is illegal, "we're not going to get into that"—despite the fact that Dumser had already testified to its illegality.

The jury thus heard uncontradicted testimony that Ontiveros's possession of the butterfly knife was illegal, although the testifying witness had no business instructing the jury on the law, nor was the legal conclusion correct unless its blade was at least two inches long. And the jury was shown images of butterfly knives that no one identified as

---

[9] The court did not say how it believed its misunderstanding affected the exhibits' admissibility.

16

conforming to any witness's description of Ontiveros's knife, and that the court described as "wicked looking," and "totally prejudicial and speculative."[10]

The prosecution used this record to its advantage during its argument to the jury. It argued that Ontiveros's aggressive intention to attack Torres was evidenced by his possession of a butterfly knife, which Detective Dumser had testified is an illegal dirk or dagger with a blade sharpened on both edges, that might be as long as six inches. But no one at all testified that Ontiveros's knife had a blade that was sharpened on both edges, or that was any longer than perhaps three inches. Ontiveros testified that its blade was about one inch long. His mother testified the same. Although Torres testified at trial that the blade was "probably about I guess as big as a pinky, maybe three inches," at the time of the incident he had described it only as shiny; about two days later he told the police that the blade was about one inch long; and at the preliminary hearing he testified that the blade was "not very big at all. Probably the size of a pinkie. Maybe half the size of a pinkie."

And the absence of an instruction that the knife was illegal only if the blade was more than two inches also enabled the prosecution to argue (without objection from the defense) that the knife evidenced Ontiveros's intention to use it as an illegal aggressive weapon: "It's illegal because it is a stabbing instrument and it's not a tool. . . . That's a stabbing instrument. It's a weapon. More so if the blade is shorter. That's what it's intended for . . . ." And again in its closing argument the prosecution argued to the jury that "we're talking about a butterfly knife that is not a tool, but is in fact a stabbing instrument. That's what it is for. It's illegal for that reason, because it is not a tool." Yet that argument was viable only if the blade had been sharpened on both edges—and there

---

[10] In ruling on the new trial motion, the court attributed the speculative nature of the images in exhibits 9 and 10 to Ontiveros, because he had discarded the knife after the incident. "We have no idea how big this knife is, whether it's two inches or ten inches. . . . And therefore any exhibit is ultimately speculative beyond – over and above the testimony."

17

was no evidence at all that it was—or if the jury had found, on appropriate instructions, that it was at least two inches long.[11]

Ontiveros was not charged with the crime of possession of an illegal knife, but the knife's supposed illegality became a factor that was used to imply his wrongful and aggressive intentions, thereby impeaching his defense of self-defense. Had the issue been addressed in an environment of appropriate objections, rulings, and instructions, it is more than probable that the jury might have given additional credit to portions of Ontiveros's account, and the outcome might have been more favorable to him.

### C. Failure to prevent or object to evidence and argument concerning juvenile record and gang membership.

Torres testified that during the fight Ontiveros had called to Martinez to help him, saying "Get him. Get him. Get him on the set." Torres testified (without objection) that to him, that meant, "Help me, we're in the same gang."[12]

Calling Ontiveros as a witness in his own defense, his counsel began by asking if he was nervous (he confirmed he was), and whether he had ever been in a courtroom before (he said he had not). Ontiveros's counsel continued her direct examination by asking him about the "BKC" initials tattooed on his arm, and (apparently alluding to Torres's testimony that during the fight Ontiveros had referred to a gang) asking whether he had ever been in a gang. Ontiveros testified that the initials on his arm referred to "Brown Kings," meaning "Brown Pride," an "adolescent group" of "a bunch of kids getting together" to paint their skateboards. He confirmed that he had once gotten in

---

[11] In ruling on the motion for new trial, the court rejected the defense reference to the minimum blade-length of two inches required by the statutory definitions of an illegal switchblade. The court recalled that it had admitted exhibits 9 and 10 (showing butterfly knives with much longer blades) only after learning that Ontiveros had admitted that he had a butterfly knife and had thrown it away after the incident. The court explained that the length of the blade was speculative, "because your client admits he threw the knife away. We have no idea how big this knife is, whether it's two inches or ten inches."

[12] The preliminary hearing transcript reflects Torres's testimony that Ontiveros had said, "Get him on the head," not "on the set." At trial Torres testified that the preliminary hearing transcript was in error.

18

trouble for that, but never did it again. And he testified he had never been in a gang, and until the trial, he had never been in a courtroom.

We need not speculate whether counsel's failure to provide Ontiveros with effective assistance at trial is shown by counsel having opened this line of inquiry, or by her failure to object when the prosecution used this minimal opening to embark on extensive cross-examination about Ontiveros's otherwise-wholly irrelevant and inadmissible juvenile court record membership in a youth "gang" unrelated to the charges against him, and his record of juvenile court proceedings six years earlier. Either way, the apparent purpose for which defense counsel had broached these subjects in the first instance was very nearly non-existent, while the resulting prejudice was—predictably— very substantial.

The prosecution hammered Ontiveros on cross-examination, about whether he had ever been convicted of a felony, about whether he was a gang member, and about whether he was lying about never having been in a courtroom before. After denying that he had a felony conviction as a juvenile, and after the court overruled counsel's objections to repeated questions about whether he had "a felony vandalism conviction as a juvenile" and "a felony vandalism conviction as part of the Brown King Crew," Ontiveros admitted that he had a felony conviction for vandalism. The prosecutor then continued questioning Ontiveros, accusingly, about having lied to the jury that he had never been in a courtroom, about having never been in a gang, and about having pled guilty to a charge of vandalism. And after confirming that Ontiveros had a nickname, the prosecution forced him to again deny that his nickname was a "gang moniker," and that he was part of a gang.[13]

Ontiveros was not charged with being a member of a criminal street gang; there was no evidence that he (or anyone else) was a member of a criminal street gang; and

---

[13] On redirect examination Ontiveros tried to explain that his juvenile record had been for "painting something" (but not buildings) when he was 14 years old; that the room in which his juvenile proceedings had been held was not like the courtroom, having just two other people, no raised judge's bench, no witness stand, and no jury box; and that the Brown Kings Crew might be characterized as a "tagging crew," but not a gang.

there was no evidence that any gang (criminal or not) had anything at all to do with the charged crime. Although Torres had initially testified that he understood the words "get him on the set" to mean "we're in the same gang," he did not say why, and he did not purport to have any basis at all for his belief. In fact, he later all but repudiated it. When asked on cross-examination to recall his testimony that "get him on the set" was "significant because that was a gang term," Torres responded, "I didn't indicate it was significant in any kind of way," he denied that he had said it was a gang term, and he denied even that he had told the police that Ontiveros had said, "get him on the set." He testified also that he understood the phrase to be "terminology in general" referring to a gang or clique, but not necessarily gang terminology.

The prosecution exploited the prejudicial impact of its examination about Ontiveros's gang membership and felony vandalism conviction, and his initial denial of those facts (which, it turns out, were not facts at all). It argued to the jury that Ontiveros had lied when he denied having been in a courtroom before; that he lied about never having been in trouble before; that there are "some hallmarks" that Ontiveros was "a sworn member of a street gang," but even if he was not, he had "lied about that too." The prosecutor argued that "I don't know if Brown Kings Crew is a gang or they are a tagging crew or if they are what counsel is suggesting an artist colony. I don't know. But he has the tattoos on his body. He's been convicted for committing a crime involving that group."

The trial's only hint of gang involvement was Torres's initial testimony that he understood "in the set" to be terminology referring to membership in the same gang—by which he meant not necessarily a gang, but maybe a "clique." Ontiveros admitted that when he was 14 years old he had been arrested for vandalism and had been in a group that identified itself as the Brown Kings Crew, whose members painted their skateboards. The evidence contained nothing indicating that Torres was qualified, either as an expert or a lay witness, to testify that "on the set" means anything relating to gangs; it contains nothing indicating that the Brown Kings Crew was a gang (even that it still existed); it contains nothing indicating that Martinez (or anyone but Ontiveros) was affiliated in any

20

way with the group called the Brown Kings Crew, let alone a street gang. Even if Torres's reference to "on the set" as gang terminology had been initially admissible (on proper objection, it was not), and even if that unjustified reference had not later been repudiated by Torres (it was), the prosecution's blatant suggestions that the crime had some gang connection and involvement were wholly unjustified.[14]

So too, the record and the law show that the prosecution's examination and argument concerning Ontiveros's juvenile record should have been excluded upon proper objection. In support of his new trial motion Ontiveros submitted copies of documentation indicating that he had successfully completed the court's requirements for deferred entry of judgment on the vandalism charges, that the court had on September 10, 2010, dismissed the juvenile petition against him, and that "[a]ll Deferred Entry of Judgment records are to be destroyed . . . and the arrest is deemed never to have occurred." At trial, after testimony that Ontiveros's juvenile record had been expunged and sealed, the prosecution did not suggest that it had not; nor do the People make any such contention on appeal. Significantly, even after Ontiveros testified that his record had been sealed, trial defense counsel neither objected to further references to it, nor obtained and presented the documentation.

Under the law, "[a] minor's admission of the charges contained in the petition [as required in order to obtain a deferred entry of judgment under Welfare and Institutions Code sections 790 et seq.] shall not constitute a finding that a petition has been sustained for any purpose," unless a previously deferred judgment is entered and a dispositional hearing is scheduled (as provided in Welf. & Inst. Code, § 793, subd. (b)). (Welf. & Inst. Code, § 791, subd. (c).) If the minor has performed satisfactorily during the period of the

---

[14] Respondent's brief does not suggest that the record contains any evidence (beyond Torres's unqualified suggestion) of gang involvement with the charged crime. But respondent's brief also goes beyond arguing just that Ontiveros was appropriately questioned about gang involvement. It argues also that "evidence of appellant's tattoos and the gang evidence were but discrete pieces of the overwhelming evidence in this case showing appellant's guilt for the charged crime," thereby explicitly contending that the jury appropriately used Ontiveros's supposed gang involvement as a factor pointing toward his guilt.

21

deferred entry of judgment, the charge or charges against the minor "shall be dismissed," the arrest "shall be deemed never to have occurred," and any juvenile court records "shall be sealed," except for very limited purposes that do not include impeachment of the minor in a subsequent trial. (Welf. & Inst. Code, § 790; *In re Mario C.* (2004) 124 Cal.App.4th 1303, 1312 & fn. 3.)

It is true that the credibility of a defendant testifying in his or her own defense may be attacked by evidence that he has suffered a felony conviction, even after the accusatory pleading has been dismissed under the provisions of section 1203.4 (Evid. Code, § 788, subd. (c)), and the expungement of a conviction under section 1203.4 does not obliterate a conviction for all purposes. (*People v. Field* (1995) 31 Cal.App.4th 1778, 1787.) However, the Welfare and Institutions Code provisions for sealing juvenile court records extend to eligible minors "a greater degree of protection from future prejudice resulting from his [or her] 'record'" than do the expungement provisions of section 1203.4. (*In re S.A.* (1970) 6 Cal.App.3d 241, 246.) That is because "[a]n order adjudging a minor to be a ward of the juvenile court shall not be deemed a conviction of a crime for any purpose, nor shall a proceeding in the juvenile court be deemed a criminal proceeding." (Welf. & Inst. Code, § 203; *In re S.A.*, *supra*, 6 Cal.App.3d at p. 246.) For that reason, applying the terms of section 1203.4, subdivision (c), to juvenile proceedings "would clearly be violative of the express terms of [Welfare and Institutions Code, then section 503, now section 203] and contrary to legislative intent." (*In re S.A.*, *supra*, 6 Cal.App.3d at p. 245; *In re Anthony R.* (1984) 154 Cal.App.3d 772, 775-776 [defendant who had admitted the allegations of juvenile petition and had been adjudicated a ward of juvenile court has not been convicted of criminal offense]; *Leroy T. v. Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 434, 439 ["adjudications of juvenile wrongdoing are not 'criminal convictions'"].)

This question was reviewed and adjudicated over five decades ago in *People v. Gomez* (1957) 152 Cal.App.2d 139 (Supreme Ct. review den.). There the prosecution had asked the testifying defendant whether he had ever been convicted of a felony, to which the defendant had answered he had not. However, the prosecution was then

permitted to continue probing, eventually eliciting the defendant's admission that as a juvenile he had been committed on charges of robbery and kidnapping, to a state hospital for the criminally insane. (*Id.* at p. 141.) On appeal, the Attorney General admitted the error, correctly conceding that "where a juvenile is subjected to proceedings in juvenile court . . . , the proceedings before the juvenile court never result in a felony conviction and, consequently, the juvenile cannot be subsequently impeached on the basis of the juvenile court proceeding," but arguing the absence of resulting prejudice. (*Id.* at p. 143.)

The court reversed the conviction, holding that the examination of the defendant about his juvenile court record violated his rights and resulted in prejudice, as impeachment for a prior offense that did not result in a felony conviction.[15] Because the jury's verdict depended in large part on its resolution of the conflicting testimony of the defendant and the complaining witness, and despite the trial court's ruling the next day striking the evidence and admonishing the jury to disregard it, the court was unable to find that in the absence of the error a different verdict would have been improbable. (*People v. Gomez*, *supra*, 152 Cal.App.2d at pp. 144, 145; see *People v. Hoffman* (1926) 199 Cal. 155, 159 ["no plea of the minor or finding of the juvenile court based thereon could amount to a conviction of a felony so as to render the record admissible for impeachment purposes]; *People v. Adams* (1926) 76 Cal.App. 178, 183-186 [trial court rulings permitting cross-examination of criminal defendant about earlier juvenile court proceedings resulted in prejudice requiring reversal].)

Here, as in *People v. Gomez* and the law upon which it relies, the prosecution far overstepped the legal boundaries that protect witnesses from impeachment by evidence of juvenile proceedings. Whether the prejudice to Ontiveros resulted from a failure by counsel to interpose anything more than minimal objections, or by the failure of the court to sustain those objections and to consider the matter in ruling on the new trial motion,

---

[15] The court found also that the prosecutor's examination about the prior offense amounted to a quest for inadmissible "criminal propensity" character evidence. (*People v. Gomez*, *supra*, 152 Cal.App.2d at pp. 144, 145; see Evid. Code, §§ 786, 1101, subd. (a).)

the result was the same. Following the legislative guidelines, the juvenile court had ruled in Ontiveros's case that "[a]ll Deferred Entry of Judgment records are to be destroyed . . . and the arrest is deemed never to have occurred." But contrary to the court's ruling, Ontiveros was then forced to admit to the jury that the juvenile arrest had in fact occurred, and he was impeached as a liar to the jury for having relied on the juvenile court's explicit ruling. That violated his rights under the applicable law, and resulted in a miscarriage of justice requiring a new trial.

### D. Defense counsel's acts and omissions deprived Ontiveros of a fair trial.

The record shows that trial counsel failed to act in a manner to be expected of a reasonably competent attorney acting as a diligent advocate for Ontiveros, and that Ontiveros was denied a fair adjudication on the issue of self-defense, due to counsel's inadequate factual and legal preparation and resulting failure to interpose appropriate objections required to protect Ontiveros's interests. (*In re Hall* (1981) 30 Cal.3d 408, 434.) Where there is no indication that defense counsel even evaluated the possibility of presenting the testimony of these witnesses, "[t]he record shows that counsel did not make a reasonable professional judgment to ignore an important corroborating witness." (*Riley v. Payne* (2003) 352 F.3d 1313, 1319 [failure to call available witness to bolster self-defense theory shows inadequate assistance of counsel].)

There could be no tactical consideration sufficient to justify counsel's failure to call Martinez, Alicia, or her mother as witnesses in Ontiveros's defense. Although each of these witnesses might have been vulnerable to impeachment on any number of grounds, no impeaching evidence could have been more prejudicial to Ontiveros's cause than their absence in the face of their obvious availability.[16] Nor can counsel's failure to adequately protect Ontiveros from examination and argument about his juvenile court record, and to provide the jury with evidence and instructions to support the conclusion

---

[16] The prosecution's only suggestion of a tactical justification for counsel's failure was that Martinez might have "a fifth amendment issue" that could preclude him from testifying. But the fact that Martinez had testified at the preliminary hearing wholly refutes this offhand suggestion.

that his knife was not an illegal weapon, be attributed to tactical considerations within counsel's discretion. In light of the record on these issues, we find it unnecessary to postpone our review until Ontiveros can provide a further factual record in a petition for habeas corpus. (See *People v. Ledesma* (2006) 39 Cal.4th 641, 746 [judgment will be affirmed on appeal if record appeal sheds no light on why counsel acted or failed to act, "'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation'"].) Where the record on appeal does not illuminate the basis for counsel's challenged acts or omissions, the claim of ineffective assistance is "more appropriately" raised in a petition for habeas corpus where there is opportunity for evidentiary hearing. (*People v. Pope*, *supra*, 23 Cal.3d at pp. 425-426; *People v. Fosselman*, *supra*, 33 Cal.3d at pp. 582-583.) But the conviction should be reversed for inadequate assistance of counsel where the record shows that counsel's challenged acts or omissions resulted from a failure to adequately research the law or investigate the facts. (*People v. Pope*, *supra*, 23 Cal.3d at pp. 425-426.) Here, counsel's initial direct examination of Ontiveros and his mother about whether Ontiveros had any record of trouble with the law, and whether he was in a gang, indicates counsel's failure to have adequately researched both the law and the facts. And counsel's failure to counter the resulting contention that Ontiveros had suffered a felony conviction for vandalism, and to produce available documentation showing that he had not, only strengthens that inference. So too, the failure to call Martinez, Alicia, and her mother to testify suggests only counsel's failure to adequately understand the need for corroboration of Ontiveros's defense. (*Riley v. Payne*, *supra*, 352 F.3d at p. 1319 [counsel's failure to investigate availability of evidence shows absence of counsel's tactical choice].)

The trial court held that the failure of defense counsel to call available witnesses to the incident did not justify a new trial, because even if Torres had been the initial aggressor, Ontiveros's defense depended on whether his response to Torres's aggression was excessive under the circumstances, and "the jury had adequate evidence to justify their verdicts."

The test is not whether the jury was justified in reaching its verdict in light of the evidence it heard and the instructions it was given, as the trial court indicated. It is whether there is a reasonable likelihood the jury might have reached a more favorable result if Ontiveros's counsel had presented the available evidence and interposed appropriate objections, as would be expected of reasonably competent attorneys. (*People v. Fosselman*, *supra*, 33 Cal.3d at p. 583 [ineffectiveness of counsel proved if counsel failed to perform with reasonable competence and "it is reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings"]; *People v. Pope*, *supra*, 23 Cal.3d at p. 425; *People v. Watson* (1956) 46 Cal.2d 818, 836.) The trial court did not address the question whether the verdict might have been different if the jury had heard the available evidence that Ontiveros had not been the aggressor; if the court had been asked to, and had, excluded or appropriately limited the evidence and insinuations of gang involvement, prior juvenile convictions, molestation of Alice, and illegal weapon possession; and if the court's instructions had reflected appropriate rulings on those valid objections. The jury had heard evidence that led it to doubt Ontiveros's defense, but due to his counsel's acts and omissions, along with some trial court error, it had not heard the available evidence that might have caused it to reach a different conclusion.

We find it reasonably probable a determination more favorable to Ontiveros would have resulted in the absence of these failings. That is the test whether his counsel's deficient performance "'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" (*People v. Andrade*, *supra*, 79 Cal.App.4th at pp. 659-660; *People v. Fosselman*, *supra*, 33 Cal.3d at p. 583.)

## Conclusion

The record shows that trial counsel failed to act in a manner to be expected of a reasonably competent attorney acting as a diligent advocate for Ontiveros; and that he was denied a fair adjudication on the issue of self-defense due to counsel's inadequate factual and legal preparation and resulting failure to interpose objections to seek appropriate rulings to protect Ontiveros's interests. (*In re Hall*, *supra*, 30 Cal.3d at p.

26

434.)  Ontiveros received prejudicially inadequate assistance of counsel at his trial, requiring reversal of the order denying his motion for new trial.  This conclusion renders unnecessary our consideration of other possible grounds for a new trial (for example, that his counsel's inadequate representation is shown by the failure to object adequately to the prosecution's insinuations that his earlier conduct with Alicia had been immoral, and that the court erred prejudicially in barring evidence that Torres had acted hostilely and aggressively toward him before the incident (see fn. 6, pp. 8-9, above).

## Disposition

The order denying a new trial is reversed, with directions to the clerk of the superior court to enter an order granting the motion.[17]

NOT TO BE PUBLISHED.


CHANEY, J.


We concur:



ROTHSCHILD, P. J.



BENDIX, J.[*]


---

[17] Pursuant to Business and Professions Code section 6086.7, subdivision (a)(2), we are required to report our reversal of the judgment for ineffective assistance of counsel to the State Bar of California for investigation of the appropriateness of initiating disciplinary action against attorney Rondee Eagle.

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.